IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ANDRE ROYAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 19-cv-05164 |
| | ) | |
| NATIONAL FOOTBALL LEAGUE | ) | **COMPLAINT FOR DAMAGES** |
| MANAGEMENT COUNCIL, | ) | |
| NATIONAL FOOTBALL LEAGUE PLAYERS | ) | **JURY DEMAND** |
| ASSOCIATION, RETIREMENT BOARD | ) | |
| OF THE BERT BELL/PETE ROZELLE | ) | |
| NFL PLAYER RETIREMENT PLAN, | ) | |
| KATHERINE "KATIE" BLACKBURN, | ) | |
| RICHARD "DICK" CASS, TED PHILLIPS, | ) | |
| SAMUEL MCCULLUM, ROBERT SMITH and | ) | |
| JEFFREY VAN NOTE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

NOW COMES Plaintiff, Andre Royal (hereinafter referred to as "Plaintiff" or "Royal"), by and through his undersigned attorneys, and hereby complains of Defendants National Football League Management Council, National Football League Players Association, Retirement Board of the Bert Bell/Pete Rozelle NFL Player Retirement Plan, Katherine "Katie" Blackburn, Richard "Dick" Cass, Ted Phillips, Samuel McCullum, Robert Smith and Jeffrey Van Note, and in support thereof will show the Honorable Court as follows:

## INTRODUCTION

1.     The National Football League ("NFL") is the single largest entertainment property in the United States making over fourteen billion dollars in the year 2018 by grabbing the weekly attention of tens of millions of viewers throughout the world. Millions of spectators tune in or show up to watch NFL professional athletes compete at the highest level and in one of the most physically demanding sports that has ever existed on this planet. These gladiators playing the game

of football are shown to know no fear and feel no pain. Sadly, as recent years have shown, this could not be further from the truth. Every impact to the brain is dangerous. Both concussive and subconcussive events cause permanent brain damage. During practice and games, an NFL player can sustain close to one thousand or more hits to the head in one season without any documented incapacitating concussion. Such repeated blows result in permanently-impaired brain function.

2.     In 2012, the world watched as more than eighty former NFL players' lawsuits against the NFL for concussion-related symptoms and injuries were merged into the first multi-district litigation against the NFL. The "NFL Concussion Litigation" was brought on behalf of more than two thousand former NFL players, surrounding the concussion phenomenon the had inundated the NFL and former football players for decades.

3.     In 2015, the NFL Concussion Litigation settlement was approved between the NFL and thousands of former players. The NFL has paid out over $650,000,000.00 for thousands of claims of former football players.[1] Unfortunately, for most former NFL players experiencing medical conditions associated with repeated head trauma, not all head injuries are treated equally. The settlement agreement between the NFL and the former football players only covered six "Qualifying Diagnos[es]", thus covering only a few different situations in which players developed, or may develop, an enumerated qualifying neurocognitive condition.[2] Those conditions are: (1) Level 1.5 Neurocognitive Impairment (as defined by the settlement terms), (2) Level 3 Neurocognitive Impairment (as defined by the settlement terms), (3) Alzheimer's Disease, (4) Death with documented Chronic Traumatic Encephalopathy ("CTE") prior to April 22, 2015, (5) Parkinson's Disease, and (6) Amyotrophic Lateral Sclerosis (ALS).[3]

---

[1] https://www.nflconcussionsettlement.com (last accessed June 1, 2019).
[2] *See id.*
[3] *See id.*

4.     If a former player's condition is not categorized under one of the six narrow "Qualifying Diagnos[es]" of the settlement agreement,  the player was left with no recourse. Many of these veteran players, before or after finding out their serious medical conditions were not covered in the NFL Concussion Litigation, turned to the Bert Bell/Pete Rozelle NFL Player Retirement Plan (hereinafter referred to as the "Plan") to see if their injuries qualified them for disability benefits under the Plan.

5.     The Plan was meant to provide for retirement, disability, and related benefits to eligible former professional football players. The Plan is an employee pension benefit plan within the meaning of 29 U.S.C. § 1002(2), and as such, is covered under the Employee Retirement Income Security Act of 1974 ("ERISA").

6.     Throughout the past twenty years, the NFL and the Plan have seen a growing number of lawsuits filed against the Plan based upon the Plan's method for administration of benefits by consistently grouping former NFL players into incorrect disability categories, and in turn, undercutting the compensation that former NFL players should receive for the total and permanent disabilities sustained during their professional careers.

7.     Most notably, in 2005 a lawsuit was brought on behalf of the estate of formal NFL player Michael "Iron Mike" Webster in 2005. This six foot one, two hundred and fifty-five pound man, four time Super Bowl champion, and hall of fame inductee, died at the early age of fifty due to a heart attack. Iron Mike was plagued with cognitive ailments stemming from his fifteen season campaign. Iron Mike, still to this day, is considered to be one of the best NFL players of all time, but his last few years were tormented by amnesia, dementia, depression, and acute bone and muscle pain.

8.     After Iron Mike's death, it was discovered that he suffered from CTE – making him the first former NFL player to be diagnosed with CTE. Iron Mike's estate brought the lawsuit against the Plan, alleging that the Plan owed Iron Mike's estate $1,142,000.00 in disability benefits. Mike Webster had applied for disability benefits under the Plan, however, was denied the highest level of benefits available to former NFL athletes. The Retirement Board of the Plan issued its final decision in 2003 with respect to Mike Webster's multiple appeals seeking reclassification into the highest disability category. The Board's final decision denied Mike Webster's last appeal and just after Iron Mike's death, his estate filed an ERISA complaint against the Plan.

9.     In 2006, the Court of Appeals for the Fourth Circuit affirmed Mike Webster's estate's judgment against the Plan, ruling that Mike Webster's estate was entitled to all of the back benefits under the Plan and the highest level of disability benefits the Plan allows for. *See Jani v. Bell*, 209 Fed. Appx. 305 (4th Cir. 2006). The Court further ruled that Iron Mike's estate could collect benefits from the date when his disability first arose, the date the disability was found, and that his total and permanent disability arose when he was an active football player in the NFL. *See id*.

10.     Andre Royal's case, as shown below, is similar to Iron Mike's case in that Andre Royal qualified for total and permanent disability benefits under the Plan, however the Plan incorrectly classified Andre Royal's condition as "Football Degenerative", a category that he was not supposed to be in, and continued to deny his appeals seeking to place him into the highest category for disability benefits under the Plan. The retirement board of the Plan intentionally and fraudulently concealed the Plan and summary plan description from Andre Royal. Andre Royal never had a copy of the Plan when he originally applied for his disability benefits in 2001, and even after repeated requests for the Plan, he was never provided the correct Plan the Board based

their final denial off of. Plaintiff also suffers from debilitating injuries stemming from the brain damage he sustained while being an active playing in the NFL. Royal, at the time of filing his initial application for benefits, and now, could not and did not understand there was a different level of disability benefits he absolutely qualified for – Active Football Total and Permanent Disability.

## NATURE OF THE ACTION

11.     Plaintiff, Andre Royal, a former NFL football player, brings this action under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq*., against the fiduciaries of the Plan to remedy the Plan's failures to make critical disclosures about the Plan that have harmed Plaintiff in originally obtaining disability benefits under the Plan and also in obtaining reclassification of his disability category of benefits under the Plan.

12.     Defendants are the administrators and fiduciaries of a disability retirement program for NFL players. The tier of benefits and accompanying level of compensation received depends, in part, on whether a player's injuries were sustained as a result of playing in the NFL. Unfortunately, many potentially debilitating conditions experienced by former NFL players may not be immediately diagnosable. Even for those whose injuries are clearly diagnosable, as in the case of Andre Royal, the NFL and the Plan refuse to reclassify him into the Active Football even though this category is based on the total and permanent disability he sustained while being an active football player in the NFL.

13.     As fiduciaries of the Plan, Defendants have an obligation to fairly administer the retirement Plan for these players and to make proper disclosures of important information about the terms of the Plan. Defendants have breached their duties to Plaintiff by failing to disclose and inform him of the peril he faced by seeking benefits without first having a clear diagnosis, clear

definitions under the Plan, and the Plan itself. Defendants have breached these duties by adopting undisclosed interpretations of key terms of the Plan that are contrary to the language in the Summary Plan Description ("SPD") as that language would be understood by the average participant of the Plan. At the same time, the SPDs have expressly discouraged the players from engaging legal counsel in their initial claim for benefits when their disability is first classified. Defendants did not reveal that these crucial terms in the Plan and the SPDs have a particular interpretation and meaning. These undefined, and critical terms in the Plan, were not revealed until the very end of the administrative process when the player-participant has sought reclassification. In Plaintiff's case, these critical terms were not revealed until he received his final denial of benefits letter from the Retirement Board.

14.     As a result of these failures to disclose, Plaintiff, disabled by League-related head trauma, sought an initial classification of benefits without being told that, by doing so, it would jeopardize his ability to seek a classification in a different category, or at the very least, that he will be subject to a much higher standard of evidence and proof in the event he sought reclassification. The effect of these failures to disclose, coupled with the discouragement of retaining counsel is that while the Plan purports to allow for reclassification, these undisclosed terms and hidden interpretations of key provisions create a trap for Plaintiff so that it was effectively impossible for Plaintiff to ever see his disability status reclassified, unless the Retirement Board so decides.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States and pursuant to 29 U.S.C. § 1132(e)(1), which provides for federal jurisdiction of actions brought under Title 1 of ERISA.

16.     This Court has personal jurisdiction over Defendants because Defendants transact business in, and have significant contacts with, this District, and because ERISA provides for nationwide service of process pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

17.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), and 28 U.S.C. § 1391(b) and (c) because some of the breaches and violations giving rise to the claims occurred in this District, and at least one of the Defendants may be found in this District.

## PARTIES

18.     Plaintiff, Andre Royal, is a former professional football player with the NFL within the meaning of Articles 1.24 ("Player") and 1.30 ("Vested Player"), of the September 1995 Plan ("the 1995 Plan") document, as amended, restated, and merged. Royal began his career with the Carolina Panthers in 1995. Royal played with the Carolina Panthers for three seasons before signing a guaranteed contract with the New Orleans Saints. The New Orleans Saints traded Royal to the Indianapolis Colts just before the first game of his four year contract. On May 11, 2000, Royal officially retired from the NFL due to the brain damage he sustained manifesting through violent seizures that regularly occurred at night. Andre Royal is a "participant" in the Plan, as defined under 29 U.S.C. § 1002(7), and a "Vested Player" as defined in Article 1.30 of the Plan. Royal qualifies for "Vested Player" status because he earned five "Credited Seasons" in the NFL.

19.     Defendant, National Football League Management Council ("Management Council"), is a non-profit association of clubs of the National Football League that is based in New York City. Pursuant to Article 1.18 of the 1995 Plan document, the Management Council is the collective bargaining representative of the "Employers." "Employers," as defined in Article 1.13 of the 1995 Plan document, are the member clubs of the league.  Pursuant to Article 10.1 and 10.2

of the Plan document, National Football League Management Council, when acting jointly with the NFL Players Association, had the power to amend the Plan. Pursuant to Article 8.1 of the 1995 Plan document, the NFL Management Council had the authority to appoint three voting members of the Retirement Board and also to remove and to appoint a replacement for any member of the Retirement Board that the NFL Management Council has appointed. By virtue of these powers to appoint and remove other fiduciaries, Defendant NFL Management Council was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and had the fiduciary responsibility to monitor the Retirement Board as an entity of the members of the Board whom it appointed, and remedy any fiduciary violations committed by the Retirement Board.

20.     Defendant, National Football League Players Association ("NFLPA"), is the labor organization representing the professional American football players in the NFL. Pursuant to Article 10.1 and 10.2 of the 1995 Plan document, the NFL Players Association, when acting jointly with the Management Council, had the power to amend the Plan. Pursuant to Article 8.1 of the 1995 Plan document, the NFLPA had the authority to appoint three voting members of the Retirement Board and also to remove and appoint a replacement for any member of the Retirement Board that the Management Council has appointed. By virtue of these powers to appoint and remove other fiduciaries, Defendant NFL Players Association was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and had the fiduciary responsibility to monitor the Retirement Board as an entity of the members of the Board whom it appointed, and remedy any fiduciary violations committed by the Retirement Board.

21.     Defendant, Retirement Board of the Bert Bell/Pete Rozelle NFL Player Retirement Plan ("Retirement Board"), is identified in Article 1.3 of the 1995 Plan document as the designated administrator of the Plan within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), a

"named fiduciary" of the Employee Stock Ownership Plan ("ESOP") within the meaning of ERISA § 492, 29 U.S.C. § 1102. The Retirement Board is and has been a fiduciary of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority or discretionary control respecting management of the ESOP, and/or had discretionary authority or discretionary responsibility in the administration of the ESOP. Specifically, under Article 8.2 of the Plan, Defendant Retirement Board was responsible for, *inter alia*, the following: defining terms of the Plan and Trust; construing the Plan and Trust; reconciling any inconsistencies in the definitions or interpretations of the Plan and Trust; deciding claims for benefits; paying all reasonable and necessary expenses of the Plan; adopting procedures, rules, and forms for the administration of the Plan; delegating authority as necessary administration of the Plan; establishing an investment policy for the Plan, selecting Trustees and setting forth terms of the Trust; selecting investment manager within the meaning of ERISA § 3(38), 29 U.S.C. § 1002(38), commencing and defending suits or legal proceedings involving the Plan and the Trust; and settling, compromising, or submitting to arbitration for claims, debts, or damages due or owing to or from the Plan or Trust. Pursuant to the SPD, the Retirement Board is composed of six voting members, three of whom are selected by the NFLPA and three of whom are selected by the Management Council.

22.     Defendant, Kathrine "Katie" Blackburn, is identified by the 2015 SPD and the 2013 SPD as one of the Management Members of the Retirement Board. Defendant Blackburn is the Executive Vice President of the Cincinnati Bengals. As a result of her membership on the Retirement Board of Directors, Defendant Blackburn is, and has been at relevant times, a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21).

23.     Defendant, Richard W. "Dick" Cass, is identified by the 2015 SPD and the 2013 SPD as one of the Management Members of the Retirement Board. Defendant Cass is the President of the Baltimore Ravens. As a result of his membership on the Retirement Board of Directors, Defendant Cass is, and has been at relevant times, a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21).

24.     Defendant, Ted Phillips, is identified by the 2015 SPD and the 2013 SPD as one of the Management Members of the Retirement Board. Defendant Phillips is the CEO/President of the Chicago Bears. As a result of his membership on the Retirement Board of Directors, Defendant Phillips is, and has been at relevant times, a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21).

25.     Defendant, Samuel McCullum, is identified by the 2015 SPD and the 2013 SPD as one of the Player Members of the Retirement Board. As a result of his membership on the Retirement Board of Directors, Defendant McCullum is, and has been at relevant times, a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21).

26.     Defendant, Robert Smith, is identified by the 2015 SPD and the 2013 SPD as one of the Player Members of the Retirement Board. As a result of his membership on the Retirement Board of Directors, Defendant Smith is, and has been at relevant times, a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21).

27.     Defendant, Jeffrey Van Note, is identified by the 2015 SPD and the 2013 SPD as one of the Player Members of the Retirement Board. As a result of his membership on the Retirement Board of Directors, Defendant Van Note is, and has been at relevant times, a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21).

28.     The "Board Defendants" collectively refer to Defendant Blackburn, Cass, Phillips, McCullum, Smith, Van Note, and the Retirement Board as an entity.

## FACTUAL ALLEGATIONS

**The Retirement Plans.**

29.     The Bert Bell/Pete Rozelle NFL Player Retirement Plan is an employee pension benefit plan within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). The relevant written instrument of the Plan within the meanings of ERISA § 402(a) is the Bert Bell/Pete Rozelle NFL Player Retirement Plan as Amended and Restated as of April 1, 2009 ("the 2009 Plan"). Since at least 1994, the Plan has provided retirement, disability, and related benefits to eligible professional football players. Plaintiff originally filed his initial claim for disability benefits under the 1995 Plan, which has been replaced by subsequent Plans.

30.     The Plan was Amended and Restated as of April 1, 2001 ("the 2001 Plan"). Even though there is a separate NFL Player Supplement Disability & Neurocognitive Benefit Plan, that plan only applies to benefits payable, and claims made, on or after April 1, 2017. The Bert Bell/Pete Rozelle NFL Retirement Plan continues to pay total and permanent disability benefits based on claims filed prior to January 1, 2015. The 2009 Plan, as stated by the Retirement Board, is the Plan that governs Plaintiff's disability benefits, even though Plaintiff has yet to ever receive a copy of the 2009 Plan.

31.     Article 5 of the 2009 Plan document addresses Total and Permanent Disability ("T&P") benefits. Article 5.1 defines "Eligibility and Amount" as follows: "Any Active Player or Vested Inactive Player . . . who is not receiving retirement benefits and is determined by the Retirement Board or the Disability Initial Claims Committee to be totally and permanently disabled as defined in section 5.2, and who satisfies the other requirements of this Section 5, will

receive a monthly total and permanent disability benefit for the months described in section 5.6 and 5.7[]."

32.    Article 1.36 of the 2009 Plan Document defines "Vested Inactive Player" to mean a "Vested Player who is not an Active Player." Article 1.37 of the Plan defines "Vested Player" as a Player who "(a) earns five Credited seasons…" Article 2 addresses eligibility under the Plan, noting that "[a]ll Players participate in the Plan."

33.    Article 5.1(d) of the 2009 Plan Document provides for Inactive benefits as follows: "This category applies if (1) the total and permanent disability arises from other than league football activities while the Player is a Vested Inactive Player, or (2) the disability(ies) arises out of League football activities and results in total and permanent disability fifteen or more years after the end of the Player's last Credited Season. The minimum benefits provided under this Section 5.1(d) will be offset by any disability benefits provided by an employer other than the League or an Employer, but will not be offset by worker's compensation."

34.    Article 5.1 of the 2009 Plan Document also provides four categories of T&P benefits, two of which are relevant here. First, Article 5.1(a) provides for <u>Active Football</u> benefits as follows: "The monthly total and permanent disability benefit will be no more less than $4,000 if the disability(ies) results from League football activities, arises while the Player is an Active Player, and causes the Player to be totally and permanently disability "shortly after" the disability(ies) first arises. Second, Article 5.1(c) provides for Football Degenerative ("FD") benefits as follows: "The monthly total and permanent disability benefits will be no less than $4,000 if the disability(ies) arises out of League football activities, and results in total and permanent disability before fifteen years after the end of the Player's last Credited Season."

35.    Article 5.2(a) of the 2009 Plan document provides that "An eligible Player will be deemed to be totally and permanently disabled if the Retirement Board or the Disability Initial Claims Committee finds that he has become totally and permanently disabled to the extent that he is substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit, but expressly excluding any disability suffered while in the military service of any country[]." At the time of the Board decision at issue, Article 5.2(b) of the Plan provided:

> Social Security Awards. Effective April 1, 2007, a Player who has been determined by the Social Security Administration to be eligible for disability benefits under either the Social Security disability insurance program or Supplement Security Income program, and who is still receiving such benefits at the time he applies, will be deemed to be totally and permanently disabled . . .

*Solomon v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 2016 U.S. Dist. LEXIS 27748, *10-11 (D. Md. Mar. 4, 2016).

36.    Article 5.5(a) of the 2009 Plan document, entitled "Initial Classification," provides "Classification of total and permanent disability benefits under Section 5.1 will be determined by the Retirement Board or the Disability initial Claims Committee in all cases on the facts and circumstances in the administrative records[]."

37.    Article 5.5(b) of the 2009 Plan document, entitled "Reclassification," provides: "A Player who becomes totally and permanently disabled and who satisfies the condition of eligibility for benefits under Sections 5.1(a), 5.1(b), 5.1(c), or 5.1(d), will be deemed to continue to be eligible only for the category of benefits for which he first qualifies, unless the Player shows by evidence found by the Retirement Board or the Disability Initial Claims Committee to be clear and convincing that, because of changed circumstances, the Player satisfies the conditions of eligibility for a benefit under a different category of total and permanent disability benefits . . ."

38.    The Summary Plan Documents presented to the players actively discouraged players from retraining counsel. The April 2013 Summary Plan Document and the 2015 Summary Plan Document both stated:

> The application forms have been streamlined and you should find them easy to complete. If you have any questions, you can call the Plan Office and ask for assistance. If you wish, the staff will fill out the application as you direct and send it to you for signature.

> You are entitled to retain an attorney or advisor should you wish to do so for any reason. However, many attorneys demand a significant portion of your disability benefits just to file the initial application.

39.    None of the materials provided by the Retirement Board defined the term "changed circumstances" and the Retirement Board never notified Plaintiff of the definition of changed circumstances until in his last and final appeal for Active Football benefits. Plaintiff was supposed to be provided with documents meant to explain the policies and procedures of the Plan, including the definitions used for the original application for benefits and in the event Plaintiff sought reclassification of benefit status, but Royal was never provided with relevant Plans nor do the Plans explain the clearly important definitions used by the Retirement Board. In these materials, the only discussion of "changed circumstances" was as follows:

> As long as you remain totally and permanently disabled, you will continue to receive total and permanent disability benefits under the category for which you first qualify, unless you present evidence for reclassification that the Disability Initial Claims Committee or the Retirement Board finds to be clear and convincing. You must be able to demonstrate that, because of change of circumstances, you satisfy the conditions of eligibility for a benefit under a different category of total and permanent disability benefits.

**Andre Royal's Claim and Appeal of Benefits.**

40.    Plaintiff Andre Royal played football for the NFL a total of five seasons at the position of linebacker. Over the course of his career with the NFL at the position of linebacker, Royal sustained numerous hits to the head, as the linebacker position is one of the most physical

and violent positions in the game of football. Just three years into his professional career, and the first year in his four year contract with the Saints, Royal began suffering from seizures, severe headaches, migraines, confusion, loss of awareness, incontinence, inability to concentrate, memory loss, insomnia, mood swings, several bitten tongues from seizures, emotional outburst, dizziness, waking up in different rooms from seizure and being unaware of what happened, nightmares, whole body shaking, difficulty finding words and loss of balance; all of which were reported to medical personnel and team doctors. The problems worsened over the next two years while Andre Royal played for the Indianapolis Colts. The problems got so bad, Royal was forced into retirement two years into his four year contract, ending his professional career in the year 2000. Royal continued all of those devastating conditions through his retirement and to this very day.

  41. Participants in the NFL Plan are eligible to apply for both T&P disability benefits and FD benefits. In March of 2000, Royal requests an application for disability benefits under the 1995 Bert Bell/Pete Rozelle NFL Retirement Plan, and Royal received the application for benefits and a letter stating that he would be receiving a cop of the Plan. However, the Plan was intentionally withheld from Royal so that he could not know the definitions in the Plan at the time of filling out his original application of benefits. Royal, a man suffering from a debilitating brain conditions manifesting in severe grand mal seizures, was taken advantage of by the Defendants and not provided the very important and relevant information needed to apply for disability benefits to ensure that the disabilities he received while being an active NFL player were compensated for. Royal was left to apply for disability benefits without the important definitions that were used throughout the application for disability benefits, as shown below:

TYPE OF DISABILITY BEING APPLIED FOR (Check each category being applied for):

    [  ]   Line-of-Duty Disability - Plan § 6
    [  ]   Active Football Total and Permanent Disability - Plan § 5.1(a)
    [  ]   Active Nonfootball Total and Permanent Disability - Plan § 5.1(b)
    [X]    Football Degenerative Total and Permanent Disability - Plan § 5.1(c)
    [  ]   Inactive Total and Permanent Disability - Plan § 5.1(d)

42.     The administrators of the Plan fraudulently and intentionally concealed the Plan from Royal, leaving Royal to try and apply for disability benefits without any important definitions or instructions to go off of. As shown above, Royal checked the "Football Degenerative Total and Permanent Disability - Plan § 5.1(c)" without ever having the 1995 Plan to reference and see which category he qualified for. In fact, Royal was told a Plan was going to be provided to him, but it never was. Royal had consistently asked for a copy of the relevant Plan that applied to his original application of benefits in 2000, but it was never provided to him. It was not until February 1, 2016, some sixteen years after he first originally applied for disability benefits, that he was provided with the 1995 Plan to help define what he was actually applying for, and which category he fit into for his total and permanent disabilities. This information was intentionally and fraudulently concealed from Plaintiff in order for him to mistakenly apply for benefits in a category that he did not fit into.

43.     On October 1, 2000, the Retirement Board received Royal's application for disability benefits. Royal, without having the relevant 1995 Plan, applied for disability benefits under the Plan for "unpredictable and uncontrollable seizures that have continued into retirement." Royal, again without having the definitions of the four relevant disability categories, checks the category for "Football Degenerative Total and Permanent Disability - Plan § 5.1(c)." Since Royal did not have a copy of the Plan, he did not know the definitions for the following disability categories, and did not know which one applied to him: Line of Duty Disability § 6; Active Football T&P Disability § 5(a), Active Non-Football T&P Disability § 5(b); Football Degenerative T&P Disability § 5(c); and Inactive T&P Disability § 5(d). Plaintiff, having retired from the game

16

of football, and as a regular participant under the Plan, checked the box of Football Degenerative because he was no longer and active football player. If Plaintiff had the relevant 1995 Plan at the time of filing out his initial application for benefits, he would have known that he qualified for Active Football disability benefits because he suffered his T&P disability *while* he was an active football player, as shown in the New Orleans Saints' and Indianapolis Colts' medical documentation showing that Plaintiff suffered from grand mal seizures.

44.     From August 2000 to April 2001, Royal visits several doctors, including personal doctors, NFL doctors, and independent doctors, to verify the T&P disabilities he suffers from. On April 30, 2001, the Retirement Board granted Royal with <u>Inactive Total and Permanent Disability benefits</u>.  The Retirement Board stated:

> At their meeting held on October 18, 2001 the Retirement Board reclassified your Total and Permanent disability benefits from Inactive category to the Football Degenerative category and established and effective date of 03/01/2001. Your gross monthly benefit will be approximately $4,000.00.

45.     At the time of the October 18, 2001 meeting, the Retirement Board knew or should have known as fiduciaries of the Plan that: (1) Royal still had not received a copy of the relevant 1995 Plan; (2) Royal received his T&P disability while he was an active football player – since it forced him to retire from the NFL; (3) Royal was determined to be totally and permanently disabled by several doctors – some who were retained by the Retirement Board; and (4) Royal should have qualified for Active Football T&P Disability category under § 5(a) of the Plan because he received his total and permanent disability while being an active player in the NFL.

46.     The Retirement Board made the decision to reclassify Royal without clearly making sure it was classifying him into the category he actually qualified for. The Retirement Board had a fiduciary responsibility to make sure Royal had the relevant documents and information to make the important selection with respect to his T&P disability classification, and ensure that he was in

the category he was supposed to be in based on what his T&P disabilities are, and when he received them. Since the Retirement Board did not provide Plaintiff with the relevant Plan at the time of his application for benefits, they should have made sure he was in the correct category for the disability he qualified for.

47.     On May 14, 2015, after finally realizing that he was not receiving the Active Football benefits he should have been entitled to, but was grouped into the Football Degenerative category, Royal files for reclassification from Football Degenerative to Active Football T&P Disability. Under the 2009 Plan, the Plan that the Retirement Board contends applies to Plaintiff's disability benefits – as well as the Plan that has yet to be provided to Plaintiff – the Retirement Board never defined "changed circumstances" that would allow Plaintiff to be reclassified into the category he was originally supposed to be in. Plaintiff continues to suffer from the same debilitating conditions that he suffered from while being an active football player in the NFL. The only thing that has changed, with respect to Plaintiff's disability benefits, is that Plaintiff had a representative appointed to monitor his disability benefits from the Retirement Board and that is when the blatant discrepancies were found. Andre Royal, having suffered from brain damage since as early as 1998, had no idea that he was classified into the wrong category, in large part because he was unable to.

48.     On June 29, 2015, the Retirement Board denies reclassification because the letter and documents sent by Royal's representative did not "present clear and convincing evidence that [Royal] meet[s] the qualifications for the Active Football category and because of changed circumstances." Shockingly, Plaintiff met the qualifications for the Active Football disability category when he originally first applied for benefits, but due to the Retirement Board's fraudulent and intentional concealment of the 1995 Plan, he was unable to apply for those benefits. Assuming,

*arguendo*, that the Retirement Board had sent Plaintiff the relevant Plan, the Retirement Board had never defined the definition of "changed circumstances" that would put Plaintiff on notice of what he needed to prove, according to the Retirement Board's fraudulently concealed definitions, what that phrase actually meant.

49.     In August of 2015, Royal's representative appeals the Retirement Board's decision and presents, based on the regular meaning of the words, clear and convincing evidence, through sixteen attachments citing various medical providers, examples of the real definitions of the applicable definitions used in the Plan, as well as documents from the teams Plaintiff played for showing that he suffered his T&P disability while being an active football player. In this appeal, Royal argued that: (1) Andre Royal's disability resulted from league football activities; (2) the disability arose when Plaintiff was an active football player; (3) Plaintiff was totally and permanently disabled while he played in the NFL, or in the alternative, "shortly after," as defined by the Plan, he retired from the NFL; (4) that FD category was not the correct category he qualified for pursuant to the 2015 Plan; and (5) Royal qualified for Active Football T&P Disability in 2000 when he first applied for disability benefits.

50.     On December 2, 2015, the Retirement Board sent Royal their Final Decision on Appeal for Reclassification and denied Royal's final appeal – this was also the first time the Retirement Board clearly defined what "changed circumstances" was, but never explained how to show "changed circumstances" by clear and convincing evidence. On February 1, 2016, two months after Royal receives the final decision rejecting his appeal, Royal finally receives from the Retirement Board a copy of the 1995 Plan that was in place at the time he first sent in his application for benefits. This document that was intentionally withheld from Plaintiff for almost sixteen years was finally provided to Plaintiff, after the Retirement Board decided his Final Appeal.

Almost sixteen years from the time the Retirement Board first told Royal he would be receiving a copy of the Plan, did Royal actually receive the Plan that he absolutely needed when he first applied for disability benefits.

**COUNT I**
**Violation of ERISA § 102(a), 29 U.S.C. §1022(a)**
**Against the Retirement Board**

51.     Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

52.     Throughout the relevant time, ERISA § 102(a), 29 U.S.C. § 1022(a), has required that Plan participants be furnished with an SPD that is "written in a manner calculated to be understood by the average plan participant" and to "be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." The SPD was to also include the Plan's eligibility requirements, as well as the "circumstance which may result in disqualification, ineligibility, or denial or loss of benefits. ERISA § 102(a)-(b), 29 U.S.C. § 1022(a)-(b); *see also* 29 C.F.R. § 2520.102-3(1).

53.     Publication of the SPD is governed by ERISA § 104(b), 29 U.S.C. § 1024(b). Defendants have been required to issue one or more SPDs pursuant to that provision but, in Plaintiff's case, waited sixteen years to provide him a copy of the Plan that applied to his original application for disability benefits in 2000. Even after finally receiving the 1995 Plan that applied to his original application for benefits in 2000, that Plan and SPD was not "written in a manner calculated to be understood by the average plan participant" with regard to "changed circumstances" under the Plan which allowed for reclassification of benefits. The Plan and SPD were also not sufficiently accurate and comprehensive to reasonably apprise participants and beneficiaries of their rights under the Plan, and did not disclose the existence of key definitions and terminology

that would be beneficial when applying for disability benefits or when seeking reclassification of disability benefits.

54.     The DOL Regulations implementing ERISA § 102, 29 C.F.R. § 2520.102-2(a), reiterate that the SPD "shall be written in a manner calculated to be understood by the average plan participant and shall be sufficiently comprehensive to apprise the plan's participants and beneficiaries of their rights and obligations under the plan." 29 C.F.R. § 2520.102-2(a) specifies that in order to fulfill these requirements, the plan demonstrator must "tak[e] into account such factors such as the level of comprehension and education of the typical participants in the plan and the complexity of the terms of the plan." 29 C.F.R. § 2520-102-2(a) further explains that in order to make the SPD understandable to the average participant, the SPD "will usually require the limitation or the elimination of technical jargon and of long, complex sentence. . .[and] the use of clarifying examples and illustrations."

55.     Through at least the 2015 SPD, the SPDs are explained that as long as a participant remained totally and permanently disabled, a participant would continue to receive benefits under the category for which the participant first qualified, "unless [the participant] present[ed] evidence for reclassification that the Disability Initial Claims Committee or the Retirement Board finds to be clear and convincing." Here, Plaintiff first qualified for the Active Football disability benefits but because of Defendants' intentional and fraudulent concealment of the necessary documents to complete the application for disability benefits, and for reclassification of disability benefits, he was unable to apply or reapply for the benefits he was originally qualified for.

56.     At least through the time when the 2015 SPD was distributed to player-participants, the SPD did not set forth an explanation of what constituted "clear and convincing evidence." None of those SPDs explained that "clear and convincing evidence" was a legal standard or legal

jargon. The SPD did not provide any examples of what would or would not constitute "clear and convincing evidence" sufficient to demonstrate reclassification.

57.    Through at least the November 2015 SPD the SPD explained that to qualify for a reclassification, the participant "must be able to demonstrate that, because of changed circumstances, [the plan participant] satisf[ied] the conditions of eligibility for a benefit under a different category of total and permanent disability benefits."

58.    At least through the time when the November 2015 SPD was distributed to player-participants  the SPD did not provide any explanation of what the phrase "changed circumstances" meant. None of the SPDs explained that "changed circumstances" had a particular meaning or that the Board had reached a specific interpretation of that phrase. Those SPDs provided no examples or illustrations of what would or would not constitute "changed circumstances" sufficient to satisfy the conditions of eligibility for a benefit under a different category.

59.    Only after submitting his claim for benefits requesting a reclassification, Plaintiff discovered that the Disability Board Defendants were not using the plain and ordinary definition for the words "changed circumstance" but had a specific interpretation that was finally disclosed in the final decision from the Retirement Board denying Plaintiff's appeal for reclassification. Plaintiff's final denial from the Retirement Board stated, "In this and all other instances, the Retirement board interprets Section 5.5(b)'s 'changed circumstances' requirement to mean a change in a Player's condition—such as a new or different impairment—that warrants a different category of benefits."

60.    Additionally, the SPDs at least through 2015 specifically discouraged participants from hiring an attorney by explaining that the application would be "easy to complete" and that

22

attorneys would "demand a significant portion of your disability benefits." Thus, these SPDs discouraged players from hiring an attorney by portraying attorneys as unnecessary expenses.

61.    By failing to draft an SPD, through at least the 2015 SPD, that properly explained the requirements to obtain a reclassification or to satisfy the conditions for eligibility for a benefit under a different category of benefits, the Retirement Board violated ERISA § 102, 29 U.S.C. § 1022(a).

62.    As a result of this violation, Plaintiff was not properly informed that subsequently seeking reclassification and/or modification of his category of benefits would require a higher standard and by completing the "easy" application early, he was unnecessarily locked into a lower category of benefits.

<u>**COUNT II**</u>
**Breach of Fiduciary Duty Pursuant to ERISA § 404(a)(A)(1)(A) & (B), 29 U.S.C.**
**§ 1104(a)(A) & (B) For Failure to Disclose Against the Board Defendants**

63.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

64.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and .... (B) with "care, skill, prudence, and diligence."

65.    An ERISA fiduciary's duty of loyalty and prudence under ERISA § 404(a)(1)(A) and (B) includes a duty to disclose and inform. Those duties not only require that a fiduciary comply with the specific disclosure provisions in ERISA, but also require (a) a duty not to misinform, (b) an affirmative duty to inform when the fiduciary knows or should know that silence

might be harmful, and (c) a duty to convey complete and accurate information material to the circumstances of the participants and beneficiaries.

66. The Board Defendants had an affirmative duty to disclose that the Plan and SPD phrase "changed circumstances" had been interpreted in a specific manner by the Board in advance of the time that Plaintiff filed his initial claim for benefits seeking a determination of disability benefits under the Plan.

67. The Board Defendants also had an affirmative duty to disclose the relevant definitions of the disability categories in advance of the time that Plaintiff filed his initial claim for benefits seeking a determination of disability benefits under the Plan. Further, the Board Defendants had an affirmative duty to ensure each Plan participant had the most recent and relevant Plan to complete the disability benefits application.

68. The Board Defendants breached their strict fiduciary duties under ERISA § 404(a) by intentionally and fraudulently concealing the 1995 Plan from Plaintiff at the time of the original application for disability benefits and by ensuring that he never received a copy of the 1995 Plan, even after repeated requests for the relevant Plan, only until the last and final decision was rendered by the Retirement Board did Plaintiff finally receive the 1995 Plan in February of 2016. The Board Defendants fraudulent concealment of the underlying ERISA violations were not isolated incidents but part of a pattern of fraudulent concealment found in most of the retired NFL Plan participants' inability to apply for the correct benefits they qualified for. This was a conscious decision made by the Retirement Board to avoid incurring additional expenses in paid benefits to Plan participants who qualified for a higher category of disability benefits than they applied for.

69. None of the materials provided by the Board to Plaintiff, before his original application for benefits and reclassification, ever defined the term "changed circumstances" or

otherwise advised Plaintiff that there was a specific interpretation of the phrase "changed circumstances."

70.     By failing to communicate this information about the interpretation of the standard necessary to obtain a reclassification or to satisfy the conditions for eligibility for a benefits under a different category of benefits, the Disability Board Defendants violated ERISA § 404(a)(1)(A) & (B), 29 U.S.C. § 1104(a)(1)(A) & (B).

71.     As a result of this intentional and fraudulent violation, Plaintiff was not adequately informed with the information to correctly apply for the benefits he qualified for and that subsequently seeking reclassification and/or modification of his category of benefits would require a higher standard that was not known to him, and that seeking any early application would unnecessarily lock him into a lower category of benefits.

### COUNT III
**Breach of Fiduciary Duty Under ERISA §§ 404(a)(1)(A), (B) and (D),
29 U.S.C. §§ 1104(a)(1)(A), (B) and (D) For Failure to Monitor Against the NFL
Management Council and NFL Players Association**

72.     Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

73.     ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries, (A) for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan, (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with ERISA.

74.     Under ERISA § 404(a)(1)(A) and (B), a fiduciary with the authority to appoint and/or remove other fiduciaries has an obligation to undertake an appropriate investigation that the fiduciary is qualified to serve in the position as fiduciary and at reasonable intervals to ensure that the fiduciary who has been appointed remains qualified to act as fiduciary and is acting in compliance with the terms of the Plan and in accordance with ERISA.

75.     Pursuant to Article 8.1 of the 2009 Plan Document, the NFL Management Council and the NFL Players Association each had the authority to appoint three voting members of the Retirement Board and also to remove and appoint a replacement for any member of the Retirement Board that they had appointed.

76.     The NFL Management Council and the NFL Players Association knew or in the exercise of reasonable diligence, should have known that: (a) SPDs did not set forth an explanation of what constituted "clear and convincing evidence" or "changed circumstances," (b) the Board Defendants had interpreted "clear and convincing evidence" or "changed circumstances," (c) the interpretation of "clear and convincing evidence" or "changed circumstances," utilized by the Board Defendants was not the meaning of those terms and phrases as would be understood by the average participant in this Plan until the final decisions rendered by the Board Defendants, (d) the Board Defendants did not disclose the meaning of those terms and phrases to Plaintiff, (e) the SPDs discouraged Plaintiff from hiring an attorney to advise him in connection with his initial claim for benefits, (f) given the Board Defendants' interpretation and application of the phrases, "clear and convincing evidence" or "changed circumstances," Plaintiff would be harmed by applying for benefits before all the information and evidence was available to establish his proper classification, and (g) Plaintiff was not provided the relevant Plans or SPD prior to him applying for disability benefits and throughout the entire reclassification appeal process.

77.     Had the NFL Management Council and the NFL Players Association properly monitored the Board Defendants, the NFL Management Council and the NFL Players Association should have done at least one or more of the following: (a) require the Board to revise the SPD to set forth an explanation of what constituted "clear and convincing evidence" or "changed circumstances" in language that Plaintiff, as the average participant in this Plan, would understand, without the use of legal jargon and by using clarifying examples and illustrations; (b) require that the Board Defendants disclose how they had interpreted "clear and convincing evidence" and "changed circumstances" prior to the time that Plaintiff sought initial classification, (c) require the Board Defendants to utilize a definition of "clear and convincing evidence" and "changed circumstances" consistent with their ordinary meaning as those terms and phrases would be understood by the average participant in this Plan, (d) require the Board Defendants to review and reevaluate any claim for reclassification where the Board had failed to disclose the Plan itself or the meaning of those terms and phrases to participants, (e) remove the language in the SPD discouraging participants from hiring an attorney to advise them in connection with their initial claim for benefits, and/or (f) remove and replace the existing Board Defendants.

78.     By failing to properly monitor the Board Defendants and/or failing to take appropriate action upon learning that the Board Defendants had breached their duties, the NFL Management Council and the NFL Players Association breached their fiduciary duties under ERISA § 404(a)(1)(A), (B) & (D), 29 U.S.C. § 1104(a)(1)(A), (B) & (D).

### COUNT IV
### Invalidation of the 2017 Amendment & Enforcement of the Terms of the Pre-2017 Plan Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Against All Defendants

79.     Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

80.     ERISA § 502(a)(3), 29 U.S.C. § 1102(a)(3), authorizes a plan participant to bring a civil action (A) to enjoin any act or practice which violates any provision of ERISA or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress violations of ERISA or the terms of the plan or (ii) to enforce any provisions of ERISA or the terms of the plan.

81.     Relief is unavailable under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) or the remedy under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) is not adequate because these claims do not seek a determination of Plaintiff's rights or benefits under the terms of the Plan, but a determination that the Amendment enacted on August 16, 2017, but made retroactive to April 1, 2017 does not, and cannot, apply to Plaintiff's claims. Therefore, a claim challenging the validity of the August 2017 Amendment is properly brought under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

82.     As a matter of both federal common law and the common law of contract, which apply to ERISA plans, the terms of the Plan are fixed at the time when performance is complete or when the participants' benefits otherwise vest, in this case, the year 2001. At the latest, once a participant has become eligible for benefits under the terms of the plan, the terms of the plan in effect on that date are the terms that govern the benefits owed to and to be paid to the participant.

83.     The 2017 Amendment is invalid to the extent that it applies to Plaintiff, as this participant of the Plan had become eligible for disability benefits prior to August 16, 2017.

84.     As a result, Plaintiff is entitled to have the 2017 Amendment declared invalid as to him, a declaration that his rights and benefits are and will be determined under the Plan in effect when he became eligible for benefits and, as necessary, Plaintiff is entitled to have the Plan reformed accordingly and/or to an injunction requiring administration of the Plan in a manner consistent with the terms of the Plan in existence at the time Plaintiff became eligible for benefits.

<u>COUNT V</u>
**Violation of ERISA § 410 & ERISA § 404(a)(1)(A), (B) Against All Defendants**

85.     Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

86.     ERISA § 410(a), 29 U.S.C. § 1110(a), provides in relevant part that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part [ERISA Part IV] shall be void as against public policy." As ERISA § 403(a) and ERISA § 404(a) are both under Part IV of ERISA, any provision that attempts to relieve a fiduciary of liability is void pursuant to ERISA § 410(a) unless there is an exception or exemption. No such exemption or exception is applicable here.

87.     Section 11.7(b) of the 2009 Plan Document provides with respect to actions other than those related to Adverse Benefit Determinations (defined in Section 11.7(a) of the Plan Document) as follows:

> [N]o action alleging an omission, violation, or breach of any responsibility, duty, or obligation imposed by this Plan (or any internal rule, guideline, or protocol) or any applicable law may be commenced after the earlier of --
>
> (l) six years after the date of the omission, violation, or breach, or
>
> (2) three years after the earliest date on which the plaintiff had actual or constructive knowledge of the omission, violation, or breach, except as provided in ERISA section 413 (but only where the fraud or concealment is separate from the offense and intended to conceal the existence of the offense).

88.     It is not clear what "except as provided in ERISA section 413 (but only where the fraud or concealment is sperate from the offense and intended to conceal the existence of the offense)" is intended to convey.

89.     In a section entitled "Limitation on Actions," the SPD states as follows:

> With respect to all other types of claims [i.e. other than a benefit claim], you may not commence a legal action in a court after the earlier of

- six years after the date of any omission, violation, or breach of any responsibility, duty, or obligation imposed by the Retirement Plan or applicable laws, or
- three years after the earliest date that you knew or should have known of any such omission, violation, or breach, except that, depending on the facts, certain exceptions may apply.

If you do file a legal action after these limitations periods have expired, the court may dismiss your claim.

90.     The SPD fails to explain the meaning of "depending on the facts, certain exceptions may apply" and does not provide any explanation, examples, or illustrations of what facts would result in an exception or under what circumstances those exceptions may apply. By failing to do so, the SPD violates ERISA § 102, 29 U.S.C. § 1022.

91.     In contrast, ERISA § 413, 29 U.S.C. § 1113 provides as follows:

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—

> (1) six years after
>      (A) the date of the last action which constituted a part of the breach or violation, or
>      (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
>
> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

92.     Unlike Section 11.7(b) of the Plan Document, ERISA § 413 does not have a provision that applies a constructive knowledge standard to limitations on actions with respect to a fiduciary's breach of any responsibility, duty, or obligation under Part IV of ERISA. Congress specifically rejected and removed a constructive knowledge standard from being imposed to

limitations on actions with respect to a fiduciary's breach of any responsibility, duty, or obligation under Part IV of ERISA

93.     To the extent that Section 11.7(b) of the 2009 Plan Document (or any other written instrument agreement) attempts to relieve these Defendants of their responsibility or liability to discharge their fiduciary duties under ERISA Part IV prior to the time that ERISA § 413 would not and ERISA § 413 would permit such an action, Section 11.7(b) of the Plan Document is void as against public policy.

94.     To the extent that any of the fiduciaries of the Plan would agree to such a provision that is void against public policy under ERISA § 410, and the meaning of such a provision was not sufficiently disclosed in the SPD as required by ERISA § 102 and the applicable DOL Regulations, Defendants breached their fiduciary duties under ERISA by failing to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries (A) for the exclusive purpose of providing benefits to participants and beneficiaries and (B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and aims, in violation of ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B).

95.     To the extent that Section 11.7(b) of the 2009 Plan Document (or any other written instrument agreement) attempts to relieve these Defendants of their liability for failure to discharge their fiduciary duties owed to Plaintiff at a time different than provided under ERISA § 413, Section 11.7(b) of the Plan should be declared void and the terms of the Plan Document should be reformed accordingly.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, prays that judgment be entered against Defendants on all claims, and request that the Court order or award the following relief:

A.     Declare that each of the above fiduciary Defendants breached his, her or its fiduciary duties under ERISA.

B.     Declare that the Plan Administrator has violated ERISA § 102, 29 U.S.C. § 1022.

C.     Order that the Plan Administrator of the Plan must disclose the standards for reclassification in the SPD and in other disclosures in language understood by the average participant in this Plan, that such disclosures will not use legal jargon or legal terms and that the disclosures must use clarifying examples to explain the meaning of "clear and convincing evidence" or "changed circumstances" to Plan participants in those documents.

D.     Declare that Plaintiff's denial of reclassifications for lack of "clear and convincing evidence" or lack of "changed circumstances" under the Board's prior interpretation be void.

E.     Order that to the extent that Plaintiff successfully obtains correct classification based on his initial application for benefits or increased benefits following the entry of this Court's Order, that Defendants must pay pre-judgment interest from the date of his initial application for benefits.

F.     Order that to the extent that Plaintiff successfully obtains reclassification or increased benefits following the entry of this Court's Order, that Defendants must pay pre-judgment interest from the date of his initial request for reclassification.

G.     Impose a surcharge against the breaching fiduciaries in the amount of attorneys' fees or expenses incurred by Plaintiff who incurred such fees and expenses in connection with his initial request for reclassification which was denied utilizing Defendants undisclosed interpretation of the phrase "changed circumstances."

H.      Declare that the 2017 Amendment and its revised standards for reclassification do not apply to Plaintiff.

I.      Declare that Section 11.7(b) violates ERISA § 410, 29 U.S.C. § 1110, and is null and void to the extent that it conflicts with ERISA § 413, 29 U.S.C. § 1113 and reform the Plan accordingly.

J.      Require Defendants to pay attorney's fees and the costs of this action pursuant to ERISA §502(g)(1), 29 U.S.C. § 1132(g)(1) and/or ordering the payment of reasonable fees and expenses of this action to Plaintiff's counsel.

K.      Award any such other relief that the Court determines that Plaintiff is entitled pursuant to ERISA §502(a), 29 U.S.C. § 1132(a) and pursuant to Rule 54(c) of the Federal Rules of Civil Procedure or otherwise.


Dated: June 1, 2019                          **Respectfully Submitted,**

                                             **HILLIARD MARTINEZ GONZALES, LLP**

                                             By: /s/ *Robert C. Hilliard*
                                             Robert C. Hilliard
                                             *Pro Hac Vice Pending*
                                             Texas State Bar No. 09677700
                                             Federal ID No. 5912
                                             bobh@hmglawfirm.com
                                             719 S. Shoreline Blvd.
                                             Corpus Christi, Texas  78401
                                             Telephone No.: (361) 882-1612
                                             Facsimile No.: (361) 882-3015


Of Counsel:
**BEN CRUMP LAW, PLLC**

Ben Crump
Florida State Bar No. 72583
court@bencrump.com

122 S. Calhoun Street
Tallahassee, Florida  32301
Telephone No.: (850) 224-2020

*ATTORNEYS FOR PLAINTIFF*